JOURNAL ENTRY AND OPINION
{¶ 1} Appellant, Marc Montgomery, appeals his conviction in the Cuyahoga County Court of Common Pleas for felonious assault, aggravated robbery, and grand theft motor vehicle. For the reasons stated below, we affirm.
 {¶ 2} On March 31, 2005, Montgomery was indicted on three counts. Count one charged Montgomery with felonious assault, in violation of R.C. 2903.11, a felony of the second degree, with a notice of prior conviction and repeat violent offender specification. Count two charged Montgomery with aggravated robbery, in violation of R.C. 2911.01, a felony of the first degree, with a notice of prior conviction and repeat violent offender specification. Count three charged Montgomery with grand theft motor vehicle, in violation of R.C. 2913.02, a felony of the fourth degree. Count three was later amended to include the name of Sheldon Beasley as the victim of the grand theft motor vehicle count.
 {¶ 3} Montgomery filed a motion to suppress his identification by the victim, which was denied by the trial court. The case proceeded to a jury trial. The trial court denied Montgomery's Crim.R. 29 motions for acquittal. The following facts were elicited at trial.
 {¶ 4} On March 1, 2005, Keith Beasley drove his father's car to his girlfriend's home on Nitra Avenue in Maple Heights. He parked his vehicle in the driveway. Around 11 p.m., Beasley was watching television when he heard his father's car start. He looked out the window and saw the car being driven out of the driveway. It had been snowing heavily, and about three inches of snow had accumulated.
 {¶ 5} Beasley ran out to the car and grabbed the driver's side door handle, which was locked, and tried to jar the door open. Beasley stated that he was not able to clearly see the driver's face, but he was able to see that the person in the car was a young black man wearing a black jacket.
 {¶ 6} Beasley testified that the man stealing the car got to the middle of the street with Beasley holding the door handle. After Beasley let go, the man drove the car forward toward Beasley, and Beasley jumped out of the way. The car went half the distance of the lawn. Beasley went running back toward the house and told his daughter to have his girlfriend call the police.
 {¶ 7} The man drove back out to the street and then down the street and around a corner, where the car was abandoned. Beasley stated the car was left in the middle of the street with the door open and the engine still running. There were no keys in the car, but the steering column had been peeled and a piece of the column had been removed.
 {¶ 8} Beasley stated that he saw footprints in the fresh snow coming from the direction of the car and going through a yard. As Beasley began heading to the next street to look for the man, the police arrived. After informing the police about the footprints and informing them that the assailant was a black male wearing a black jacket, Beasley went back to his girlfriend's house. Beasley did not see anyone else during this time wearing a black jacket. Beasley testified "there was no one else outside. It was snowing and it was cold."
 {¶ 9} A little later the police showed up at the house with a man and asked Beasley if he recognized the jacket the man was wearing. Beasley indicated he was positive it was the same jacket he had seen on the man that took the car. He described the jacket as being black and "like a winter jacket. Not real big, but kind of fluffy like." Beasley also stated the man was a light-skinned black male who fit the approximate description of the person he had given to the police earlier that evening. At trial, Beasley identified Montgomery as the person who the police brought to the house.
 {¶ 10} Montreal Phillips, Beasley's girlfriend and the mother of his daughter, testified that she observed the subject auto backing out of the driveway and pulling onto her front lawn. She stated the vehicle came "pretty close" to Beasley and would have hit Beasley if Beasley had not moved. It appeared to Phillips that the person driving the car was trying to hit Beasley. Phillips confirmed that she called the police.
 {¶ 11} Officer Robert Voll testified that he and other officers were dispatched to the area of the stolen vehicle. Officer Voll stated that when he arrived, he came upon Beasley, who explained what had happened. Officer Voll obtained a general description of the suspect from Beasley and relayed the information to dispatch for other units. Officer Voll became a perimeter unit, while other units followed the footprints. He was present when the suspect's footprint was compared with the footprints that were followed. Officer Voll stated that the footprints appeared to be an exact match. At trial, Officer Voll identified Montgomery as the suspect who was apprehended.
 {¶ 12} Sergeant Timothy Barfield testified that he arrived at the point where the vehicle had been recovered and the suspect had fled on foot. Sgt. Barfield noticed from the tire tracks that the car had spun out and that the person who stole the vehicle had lost control of the vehicle where it spun out. He also observed a set of fresh footprints, made by boots, that went around the front of the vehicle and headed into a yard. Sgt. Barfield stated that he observed only one set of footprints in the area and that it was snowing heavily and the snow was rather deep.
 {¶ 13} Sgt. Barfield followed the footprints through yards, over fences, across streets, through a wooded area, near a school, through more yards, and ultimately met up with another officer, Sgt. Hansen. Sgt. Barfield indicated there were no other footprints besides the set he was following. He also guessed that if he had not followed the prints, they would have been covered with snow in five to eight minutes. He believed that as he followed the footprints, the suspect was not that far ahead of him.
 {¶ 14} After Sgt. Hansen showed up, the two officers continued to follow the footprints until they heard that Officer Halley had found the suspect. As Officer Halley was bringing the suspect over to their location, Sgt. Barfield followed the footprints to the point where the suspect was picked up, in order to make sure the footprints led to the suspect. Sgt. Barfield confirmed that they did. He also stated that there was no break in the flow of the footprints he had followed and that the prints were consistent all the way through.
 {¶ 15} Upon seeing the suspect, Sgt. Barfield observed that the suspect had visible sweat on his head. Although the suspect said he had just been walking in the street a couple of blocks, Sgt. Barfield indicated that the suspect was very wet and had mud on his knee. Sgt. Barfield observed the suspect place a boot print next to the set that the officers had been following. He noticed that it was the same as the boot print they had been following.
 {¶ 16} When Sgt. Barfield went to Beasley's girlfriend's home, he was surprised by what he saw. He noticed from the tire tracks that the car had backed up onto the tree lawn across the street, and instead of turning onto the street, the car was driven immediately back into the front lawn. Sgt. Barfield stated that it did not appear the car may have skidded or slid into the front yard, but rather, "it was very obvious this was a very intentional act."
 {¶ 17} At trial, Sgt. Barfield identified Montgomery as the person taken into custody at the end of the foot pursuit.
 {¶ 18} Patrolman Thomas Halley testified that he was involved in the search for the suspect and spotted somebody walking in the area the officers were tracking. Patrolman Halley approached the suspect and spoke with him. The suspect indicated he had been at his girlfriend's on South Boulevard. Patrolman Halley observed that the suspect had fresh mud on his jeans and that his jeans were wet to about the mid-calf area. Patrolman Halley identified Montgomery as the person he apprehended.
 {¶ 19} Lovetta Ward, who knows Montgomery through her daughter, testified that the police came to her house on South Boulevard and asked if Montgomery had been there to visit. Ward stated that she had not seen Montgomery.
 {¶ 20} Sgt. Todd Hansen testified that he responded to the scene and met up with Sgt. Barfield. The two of them followed the footprints until hearing that the suspect had been picked up by Patrolman Halley, who brought the suspect over to Sgt. Hansen's location. Sgt. Hansen indicated that the suspect claimed he had just walked a few blocks from Lovetta Ward's house on South Boulevard. Sgt. Hansen observed that the suspect had visible sweat on his forehead, he had mud on his knee, and his pants were wet up to mid-calf level.
 {¶ 21} Sgt. Hansen stated he had no doubt that the individual he had followed was Montgomery. He stated that the officers followed one continuous set of prints that led to Montgomery, and when a footprint from Montgomery was compared to the prints the officers had followed, "it was the exact same size, the tread pattern was exact." At trial, Sgt. Hansen identified Montgomery as the suspect who was apprehended.
 {¶ 22} After hearing the above testimony, the jury returned a verdict of guilty on all counts. With respect to the specifications, the trial court granted Montgomery's motion to declare the repeat violent offender statute unconstitutional. The jury made findings consistent with the notice of prior conviction specifications.
 {¶ 23} The trial court sentenced Montgomery to a prison term of 3 years for the felonious assault, 3 years for the aggravated robbery, and 12 months for the grand theft motor vehicle.
 {¶ 24} Montgomery filed this appeal, raising two assignments of error for our review. His first assignment of error provides the following:
 {¶ 25} "Whether the victim's pretrial cold stand identification of the defendant-appellant as unreliable and impermissibly suggestive."
 {¶ 26} Montgomery argues that the pretrial identification of Montgomery by Beasley should have been suppressed because the "show-up" or "cold-stand" identification was unduly suggestive and unreliable under the totality of the circumstances. The state argues that Montgomery's argument is without merit because the victim in this case never actually made a positive identification of the perpetrator and because Montgomery was convicted on circumstantial evidence. We agree with the state.
 {¶ 27} Beasley clearly testified that he did not know the perpetrator and did not see his face at the time of the incident. Rather, the only information provided by Beasley was that the perpetrator was a young black man, wearing a black winter-like jacket matching the one worn by Montgomery.
 {¶ 28} Courts have repeatedly recognized that identification can be proved by circumstantial evidence, e.g., State v. Kiley,
Cuyahoga App. Nos. 86726, 86727, 2006-Ohio-2469; State v. Irby,
Mahoning App. No. 03 MA 54, 2004-Ohio-5929; State v. Moore
(Apr. 19, 2000), Summit App. No. 19544; State v. Cardwell
(Sept. 2, 1999), Cuyahoga App. Nos. 74496, 74497, 74498. As this court stated in State v. Kiley, supra:
"It is well settled that the state may rely on circumstantialevidence to prove an essential element of an offense, becausecircumstantial evidence and direct evidence inherently possessthe same probative value. State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus.`Circumstantial evidence' is the proof of certain facts andcircumstances in a given case, from which the jury may inferother connected facts which usually and reasonably followaccording to the common experience of mankind. State v.Duganitz (1991), 76 Ohio App.3d 363, 601 N.E.2d 642, quotingBlack's Law Dictionary (5 Ed. 1979) 221. Since circumstantialevidence and direct evidence are indistinguishable so far as thejury's fact-finding function is concerned, all that is requiredof the jury is that it weigh all of the evidence, direct andcircumstantial, against the standard of proof beyond a reasonabledoubt. Jenks, 61 Ohio St.3d at 272. Although inferencescannot be based on inferences, a number of conclusions can resultfrom the same set of facts. State v. Lott (1990),51 Ohio St.3d 160, 168, 555 N.E.2d 293. Therefore, the [trier of fact]may employ a series of facts or circumstances as the basis forits ultimate conclusion. Id. * * * Identification can be provedby circumstantial evidence, just like every other element thestate must prove."
(Internal quotation marks omitted.)
 {¶ 29} In this case, the officers testified that they followed one set of footprints in fresh snow that led them to Montgomery. Montgomery had on a black jacket and his boot print matched the footprints that were being followed. His pants were wet to the knee and had mud on them. Beasley testified that the man the police brought to his girlfriend's house after the incident had on the same black jacket as the man who took the car. We find the circumstantial evidence in this case was sufficient to establish the identity of Montgomery as the person who perpetrated the crimes charged. We also find the trial court did not err in denying the motion to suppress or in denying the Crim.R. 29 motions for acquittal. Montgomery's first assignment of error is overruled.
 {¶ 30} Montgomery's second assignment of error states the following:
 {¶ 31} "Whether the trial court erred in its judgment because the jury verdict of guilty to felonious assault, O.R.C. 2911.11, aggravated robbery, O.R.C. 2911.01, and grand theft motor vehicle, O.R.C. 2913.02, was against the manifest weight of the evidence."
 {¶ 32} In reviewing a claim challenging the manifest weight of the evidence, the question to be answered is whether "there is substantial evidence upon which [the trier of fact] could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Leonard, 104 Ohio St.3d 54, 68, 2004-Ohio-6235 (internal quotes and citations omitted).
 {¶ 33} Montgomery argues that the identification of Montgomery was extremely weak at best. We disagree. Although Montgomery points to the difficulty Beasley had in seeing his perpetrator because of the snow, Beasley was able to provide a description of the perpetrator's jacket. Further, while Montgomery argues that the police did not introduce photographs of the crime scene or enter the boots worn by Montgomery into evidence, credible testimony was introduced by the officers concerning the footprints that were followed and their observation that they matched Montgomery's boot print. The Ohio Supreme Court has held that "proof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence." State v. Jenks (1991),61 Ohio St.3d 259, 272, quoting State v. Nicely (1988), 39 Ohio St.3d 147,151. Circumstantial evidence has no less value than the other forms of evidence and may be used to establish guilt beyond a reasonable doubt. Jenks, 61 Ohio St.3d at 272. It is for the trier of fact to weigh all of the evidence, whether direct or circumstantial, against this standard of proof. Id.
 {¶ 34} After thoroughly reviewing the entire record and considering the totality of the circumstances surrounding Montgomery's apprehension, we find any rational trier of fact could have found the essential elements of the crimes proved beyond a reasonable doubt, and we conclude Montgomery's conviction for the crimes charged was not against the manifest weight of the evidence. Montgomery's second assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Celebrezze, Jr., P.J., and Corrigan, J., Concur.